647 A.2d 830

**STATE of Maryland, et al.**

v.

**Cedric MEADE.**

**No. 1677, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Sept. 1, 1994.

Reconsideration Denied Oct. 25, 1994.

514

William R. Phelan, Jr., Sr. Sol., Baltimore, for appellant, State of Maryland.

Randall J. Craig, Jr. (Bernadette Gartrell and Gartrell & Associates, on the brief), Silver Spring, for appellant, Gabriel Bewley.

William Murphy, Jr. (Murphy & Gutierrez, Ronald M. Cherry, Louise McB. Simpson and Redmond, Cherry & Burgin, P.A., on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and BISHOP, J., and MARVIN H. SMITH, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

WILNER, Chief Judge.

In the early morning hours of April 26, 1991, appellant Gabriel Bewley, a Baltimore City police officer, attempted to place appellee Cedric Meade under arrest for loitering. Meade refused to submit and, instead, attempted to flee. With his gun drawn, Bewley chased him through the streets and alleys of the neighborhood, eventually caught up with him, and shot him in the chest. Meade was severely injured. Following the shooting, Officer Bewley charged Meade with resisting arrest, assault, disorderly conduct, and unlawful loitering. Those charges were eventually placed on the "stet" docket by the State, where they remain to this day.

Mr. Meade sued the State of Maryland, the City of Baltimore, Officer Bewley, and a number of other individuals for a variety of torts. All of the defendants, except the State and Officer Bewley, were eventually dismissed from the case. In special verdicts, the jury found that Bewley had committed assault and battery, false arrest, and false imprisonment but that, in doing so, he acted without malice; that in pressing charges against Meade he also committed malicious prosecution; but that he did not commit an intentional infliction of emotional distress. The jury found compensatory damages in the amount of $1,545,813, consisting of $30,542 for past medical expenses, $15,271 for future medical expenses, and $1,500,-000 for non-economic damages. The court reduced the non-economic damages to $350,000, otherwise denied the post-trial motions, and entered judgment accordingly.

Because of the jury's finding that the assault, battery, false arrest, and false imprisonment were committed without malice, the court concluded that Officer Bewley had public official immunity with respect to those common law torts, and it therefore entered the judgment on those findings under Count IV of the complaint, charging Bewley and the State with violating Meade's rights under articles 24 and 26 of the

Maryland Declaration of Rights, for which common law immunity does not exist.[1]

All three parties have appealed. The State presents two issues. Its major complaint is that the court erred in holding the State liable for the tortious conduct of a Baltimore City police officer. Such officers, it argues, are not within the ambit of the State Tort Claims Act, and the State has therefore not waived its immunity with respect to their conduct.[2] Officer Bewley takes a very different position as to that; he avers that the Tort Claims Act *does* cover City police officers and that, under that Act, he is entitled to immunity, even as to State Constitutional claims, so long as he was acting within the scope of his employment and without either malice or gross negligence.

Bewley makes a number of other complaints as well. He contends that the court erred (1) in finding as a matter of law, and so instructing the jury, that he had no probable cause to arrest Mr. Meade and that the arrest was therefore in violation of articles 24 and 26 of the Maryland Declaration of Rights; (2) in instructing the jury in such manner as to permit it to find that the actual shooting, even if accidental, nonetheless constituted a violation of articles 24 and 26; (3) in refusing to instruct that the arrest and the shooting were

---

**1.** Maryland Declaration of Rights, art. 24, the State analog to the due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution, provides:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

Art. 26, the State counterpart to the Fourth Amendment, states:

"That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous [grievous] and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted."

**2.** The State also avers that there was insufficient evidence to sustain the jury's award for future medical expenses. It will not be necessary for us to address that issue.

separate issues for purposes of assessing liability and damages; and (4) in allowing the jury to find liability for malicious prosecution when there was no finding of malice for the arrest and the charges stemming from the arrest were placed on the "stet" docket.

Mr. Meade complains only about the damages. He urges that the court (1) should have allowed the jury to assess damages separately for the Constitutional torts (Count IV) and the malicious prosecution (Count VII), and (2) erred, for several reasons, in applying the statutory "cap" for non-economic damages (Md.Code Cts. & Jud.Proc. art., § 11–108) and thus reducing that part of the jury's verdict.

### Underlying Facts

In order to place the various issues raised in a proper context, it is important to revisit some of the underlying facts and factual disputes.

Mr. Meade testified that, on the night in question, he was living with his grandmother about a half block from the corner of Druid Hill Avenue and Whitelock Street in Baltimore City. He returned home late that night, around 1:00 in the morning, and his grandmother refused to open the door for him. He therefore decided to take a bus to a friend's house and waited on the corner for the bus. Another friend, Howard Mack, happened to be standing on the corner and waited with him. There was evidence that, at that hour of the night, buses came in 25–minute or greater intervals.

After Meade had been waiting about 20 minutes, Officer Bewley pulled up, got out of his cruiser, directed Meade and Mack to place their hands on the car, and thoroughly frisked both of them. No weapons or contraband were discovered. When Bewley learned that Mack was a juvenile, he released him but told Meade, who was over 18, that "he was going to make an example of him." Meade then fled. Officer Bewley gave chase but, at some point, tripped and fell, whereupon some neighbors who were sitting on their steps jeered at the officer. Bewley then shouted that, if Meade did not stop,

Bewley would "blow [his] black ass head off." [3]   Meade kept running, noticing at the time that Bewley had his gun drawn. When Meade got to the end of Traction Street, he ran into Officer Bewley, who had circled the area and was waiting for him with his gun drawn.   At that point, according to the narration in Meade's brief:

"Mr. Meade immediately put his hands in the air, and started walking towards Officer Bewley slowly.   When Mr. Meade got close to Officer Bewley, the officer grabbed him around the neck with his right (gun) arm, and knocked him onto his stomach.   Mr. Meade turned over onto his back. As he did so, Officer Bewley stuck his gun into Mr. Meade's mouth and told him not to move.   Officer Bewley then removed his gun, again ordering him not to move.   Without further provocation, Officer Bewley then leaned back, and shot Mr. Meade in the stomach."

Officer Bewley told a very different story, involving not one, but two encounters with Meade that evening.   He said that, while on routine patrol, he observed Meade standing about five to ten feet from the corner.   Although there were many people in the area, "all over the place," Meade was alone. Estimating that Meade was standing within 50 feet of Little Willie's Tavern, Bewley told him, in effect, "to vacate the corner due to the loitering laws or he would be subject to being arrested."   Officer Bewley had in mind Baltimore City Code, art. 19, § 56, which provides, in relevant part, that it is unlawful for any person standing or loitering within 50 feet of a retail establishment which sells alcoholic beverages "in such manner as to obstruct free passage on or along the street or sidewalk, to disobey a request by a police officer to move on."

Officer Bewley had not seen Meade before and had no idea how long he had been standing on the corner.   Prior to his accosting Meade, Bewley did not see anyone walking by him or anyone being obstructed from passing him.   The sidewalk at the location was 10 feet in width.   It is evident from his

---

3.   This was not a racial confrontation.   Both Meade and Bewley are black.

testimony that he was concerned because the area was a high-crime, drug-infested area and that he wanted to clear the corner of loiterers. Bewley said that Meade acknowledged the warning and began to walk away. In later testimony, he said that Meade "did leave the corner. I know he left that area." The officer got back into his car and resumed his patrol.

Bewley said that he returned to the corner about 20 minutes later and again saw Meade standing there, this time with another young man, Mr. Mack. Other people were walking up and down the street. Bewley called Meade and Mack over to his car, allowed Mack to leave, but announced that Meade was under arrest for loitering. At that point, Meade fled. Bewley drew his weapon as he chased Meade down an alley, but reholstered it when he temporarily lost sight of his suspect. Seeing him again, Bewley resumed the chase, drawing his weapon again when he saw Meade "messing with the front of his pants." He said he thought that Meade "had some sort of weapon that could harm me."

Bewley circled the area and apparently met up with Meade at the end of an alley. With his gun pointed, he ordered Meade to "freeze," whereupon Meade slipped and fell. Bewley placed his left hand on Meade's shoulder to gain control, but Meade continued to "flop around and move in an effort to try to get up." The officer ordered him to stop moving, to no avail. All of a sudden, he said, Meade turned around with his hands up and grabbed the officer's weapon, causing it, accidentally, to discharge. Evidence was presented that between eight and nine pounds of pressure was required on the trigger for the gun to discharge.

Upon this conflicting evidence, the major factual disputes were whether there had been one encounter or two, whether Officer Bewley had thoroughly frisked Meade before the chase began and thus knew that Meade was unarmed, and what actually caused the gun to discharge. Among the legal issues generated by this evidence, aside from the immunity questions, were whether Officer Bewley had probable cause to

place Meade under arrest, whether, in any event, he had the right to threaten and use deadly force, and whether any of his conduct was malicious.

*Immunity: The State and Officer Bewley*

As indicated, in light of the jury's determination that Officer Bewley did not act with malice in accosting, arresting, chasing, and shooting Mr. Meade, the court found him, and the State, protected by common law public official immunity with respect to the direct torts pled in Counts I (assault and battery) and II (false arrest and imprisonment). It also concluded, however, that this non-malicious conduct did constitute a State Constitutional tort—a violation of Meade's rights under articles 24 and 26 of the Maryland Declaration of Rights as pled in Count IV of the complaint.

Applying the Maryland law enunciated in *Clea v. City of Baltimore,* 312 Md. 662, 680–85, 541 A.2d 1303 (1988) and *Ritchie v. Donnelly,* 324 Md. 344, 374, 597 A.2d 432 (1991), the court held that Officer Bewley enjoyed no common law immunity for such Constitutional torts. By virtue of certain 1989 amendments to the definition of "State personnel" in the State Tort Claims Act (Md.Code State Gov't. art., § 12–101), the court held that Baltimore City police officers had been excluded from the protection of that Act, and that, as a result, the State had not waived its sovereign immunity for the conduct of City police officers and had thus left such officers without statutory immunity. Notwithstanding this conclusion, it seems that judgment was, in fact, entered against the State, although the basis for that judgment is not entirely clear. The docket entry initially recording the judgment on the verdict indicates that it was against both Officer Bewley and the State and, except for the remittitur for non-economic damages, that judgment was not disturbed. We assume, therefore, that the judgment *was* entered against the State.

The court became aware, however, that, through a number of Resolutions approved by the City Board of Estimates, the City had adopted a formal policy of indemnifying its employ-

ees and public officers from monetary loss due to non-intentional acts of negligence committed within the scope of their employment and that, in 1992, following the *Ritchie* case, the Board of Estimates had specifically agreed to provide a defense to police officers in civil actions and to indemnify the State if it were sued and suffered any loss. These Resolutions were admitted as exhibits by the court, and, upon them, the court assumed, as a practical matter, that the judgments entered against Officer Bewley would ultimately be paid by the City. Indeed, its final conclusion was that Officer Bewley "is not entitled to the immunity of the Maryland Tort Claims Act" but that "he is entitled to fall under the indemnity provision between Baltimore City and the Baltimore City Police Department."

This last assumption puts a special gloss on the argument made by the State, as appellant. The State is represented in this appeal not by the Attorney General but rather by the City Solicitor of Baltimore, who does not even mention in his brief and did not mention at oral argument the fact that the court found the State itself to be immune and that the real party in interest, other than Officer Bewley, is the City of Baltimore.

There are a number of sub-issues raised by the parties with respect to the immunity question, but we think only one needs to be addressed. We shall conclude that the State is immune because of the 1989 amendments to the definition of "State personnel" and shall therefore reverse the judgment entered against it. For that same reason, we shall conclude that Officer Bewley has no statutory immunity and that he also enjoys no common law immunity.

That Officer Bewley has no common law immunity is clear from *Clea* and *Ritchie, supra,* and is really not contested. In both of those cases, the Court confirmed that a common law action for damages will lie for violations of articles 24 and 26, that the public official who violates them does not have common law public official immunity, but that, absent legislation consenting to suit, the doctrine of sovereign immunity

precludes an action for damages against the State. *See Ritchie*, 324 Md. at 373–74, 597 A.2d 432.

In *Clea*, a City police officer, the City Police Department, and the City itself were sued following the officer's wrongful entry into the plaintiff's home in execution of a search warrant meant for another address. Holding that the City Police Department was a State, not a City, agency, the Court concluded that, as a result, the City was not the officer's employer and therefore could not be held liable as such for his wrongful conduct. The Police Department itself was entitled to the State's sovereign immunity, except to the extent that such immunity had been waived by statute. Although noting that the Tort Claims Act had been substantially broadened in 1985, the Court did not address the scope of those amendments because the conduct at issue predated them.

Notwithstanding the non-applicability of the 1985 amendments to the conduct at issue in *Clea*, the *Clea* Opinion, filed in June, 1988, certainly raised the specter of State liability for the conduct of persons regarded as State officers but who were neither paid nor directly controlled by the State. The State Treasurer's Office, which was responsible for providing purchased or self-insurance to cover claims made under the State Tort Claims Act (*see* Md.Code State Fin. & Proc. art., § 9–105(c)), was sufficiently concerned about that prospect to draft and present to the 1989 session of the General Assembly a departmental bill (HB 364) to narrow the scope of the Act.

At the time, by virtue of the definition of "State personnel" in § 12–101 of the State Government article, the State appeared to have waived its immunity with respect to the conduct of "an individual who, *with or without compensation*, exercises a part of the sovereignty of the State." (Emphasis added.) In testimony on the bill, the Treasurer's Office stated, in relevant part:

"The bill amends Section [12–101] to establish a more definitive definition of State personnel. It is the Treasurer's Office belief that the Tort Claims Act was enacted to cover individuals whom the State paid and controlled; the

Office believes, further, that the intention of the annual appropriation is to fund coverage for those individuals whose programs are funded under the budget. Under the current definition, the State may be assuming a much broader liability for the actions of employees of local government—*especially law enforcement personnel who could be deemed to exercise the derivative sovereign power of the State. There have, in fact, been claims filed seeking recovery for action by local policemen; and the court has indicated, at least in one instance, that the State is probably the responsible party.*"

(Emphasis added.)

Although the definition was amended in a number of other respects, the relevant amendment for our purposes was that waiving immunity only with respect to a State employee or official who is paid in whole or in part by the State Central Payroll Bureau in the Comptroller's Office or who *without compensation* exercises a part of the sovereignty of the State.

The 1989 legislation, as enacted, was clearly effective to reinstitute the State's sovereign immunity for conduct committed by Baltimore City police officers, among others. They are not paid by the Central Payroll Bureau and do not exercise any part of the sovereignty of the State without compensation. It is clear, then, that the State, retaining its common law sovereign immunity, is not liable for Officer Bewley's conduct, and the judgment entered against it must be reversed. It follows equally that, as Officer Bewley is not included within the ambit of "State personnel," he does not enjoy the statutory immunity provided under the Tort Claims Act (§ 12–105).

Because of this conclusion, we need not consider whether, under the Tort Claims Act, the State has waived its common law immunity for State Constitutional torts. Nor, because the issue was not raised in the State's brief or at oral argument, need we consider whether the City is liable under the indemnity agreements and resolutions.

*Probable Cause*

■ Meade's claims for false arrest and false imprisonment, both as independent torts and as predicates for the article 24 and 26 violations, depended in part on whether Officer Bewley had probable cause to make an arrest. That is also the case with the claim for malicious prosecution. The court informed the jury, as to each of these claims, that it had determined as a matter of law that Officer Bewley did *not* have probable cause to make the arrest. Bewley challenges that determination.

The arrest, as we indicated, was for violation of the City loitering law, quoted, in part, above. A violation of that ordinance, as it relates to this case, requires three things: (1) that Meade was standing or loitering within 50 feet of an establishment selling alcoholic beverages; (2) that he was standing or loitering in a manner obstructing "free passage on or along the street or sidewalk"; and (3) that he disobeyed a request by a police officer to move on.

In judging this question, we need to consider the evidence in a light most favorable to Officer Bewley. We therefore must, for this purpose, reject entirely Mr. Meade's recitation of what occurred—the single encounter in which no request to move was made—and look instead only at Officer Bewley's account. Moreover, it is clear from that account that only the first encounter is relevant; when he returned, Officer Bewley effected the arrest, or attempted to, without any further warning to move and without any indication that Meade, at that time, was obstructing pedestrian traffic.

Officer Bewley testified that, when he first came upon Meade that evening, he believed that Meade was standing within 50 feet of Little Willie's Tavern. He made no measurements, nor did anyone else, but estimated that Meade was within that distance. Meade more or less concedes in his brief that, given this testimony, a lack of probable cause cannot be based, as a matter of law, upon a finding that he was not within 50 feet of an establishment selling alcoholic beverages.

526

The question, really, is whether there was any substantial evidence to support a conclusion that Meade was obstructing passage.  Officer Bewley was questioned about this and never gave a clear statement indicating that Meade was, in fact, obstructing any pedestrian traffic.  Bewley saw people passing by on the 10–foot wide sidewalk, and he gave no evidence that anyone was forced to walk into the street or to step substantially out of his or her way in order to pass.  Mere presence on the corner, even if it causes another person to take a one- or two-step detour to avoid colliding, does not constitute an obstruction of passage.  If it did, no one could stand on a public sidewalk near one of the enumerated establishments after being asked to move by a policeman; the police would, in effect, be able to clear the sidewalks arbitrarily, at their will.  The court correctly concluded that there was no evidence tending to show that Mr. Meade was obstructing free passage on the sidewalk and, for that reason, no probable cause to believe that he was violating the loitering ordinance.[4]

### Instruction As To The Shooting

As we said, Officer Bewley and Mr. Meade gave very different versions of what occurred.  Meade mentioned the single encounter when he was accosted and thoroughly frisked.  If that were the case, Bewley would have known that Meade was not armed.  Bewley said that he had not frisked Meade and that he became apprehensive after seeing Meade reach into the front of his pants as the chase proceeded.

In its instructions on assault and battery, the court informed the jury that an officer may use reasonable force to discharge his official duties and that he may use deadly force

---

4. It is evident that Officer Bewley was concerned in general about people loitering in what he regarded as a high-crime, drug-infested area.  That concern is legitimate.  But people, even those in high-crime, drug-infested areas, have a right to be on the public sidewalks if they are conducting themselves in a law-abiding manner.  Officer Bewley did not know Mr. Meade, had no reason to believe that he was an unsavory character, and did not see him engaged in any furtive or suspicious activity.  He was simply standing, peaceably, on or near the corner, not bothering anyone, not obstructing anyone.

if he reasonably believes that he is in imminent danger of losing his life or suffering great bodily harm. The court summarized the different versions given by the parties and told the jury that, if it accepted Meade's account that he was frisked by Bewley and that Bewley thus knew Meade was unarmed, "then Officer [Bewley] could not be said to have a reasonable belief he was in imminent danger...." It said further that if, on the other hand, the jury believed that Officer Bewley did not frisk Mr. Meade, it would then have to decide whether Bewley reasonably believed that he was in such danger. The court ended this part of the discussion with the instruction that: "Thus, *even if you found that the shooting was accidental in the end,* if you find, as I have instructed you, that Officer Bewley did not have the privilege to use deadly force that evening, he would be liable for a constitutional violation even if he did not act with malice." (Emphasis added.)

Officer Bewley objected to that part of the instruction suggesting that, "if the jury finds that the defendant accidentally assaulted or battered the plaintiff, then the defendant can be held liable under the constitution." The court responded that its instruction was conditioned on the jury finding that Officer Bewley had no right to use deadly force, and that in that event "he is responsible even if that gun accidentally went off." Bewley persisted that, under the instruction, he would, in effect, be "strictly liable for everything that happens with the gun" even if the ultimate discharge of the weapon was accidental. The exception was overruled, and Officer Bewley presents the argument to us.

The issue, at first blush, appears to be one of causation—of intervening cause—but it focuses also on the foreseeability of the harm that ultimately ensued. As the instruction was framed, liability was premised on the court's finding that Officer Bewley had no probable cause, and therefore no legal right, to arrest and chase Mr. Meade and upon the jury's further finding that he had no right under the circumstances to use deadly force—to draw his loaded weapon and aim it at Mr. Meade. Assuming that major premise, the question

engendered by Officer Bewley's testimony that the gun discharged when Mr. Meade grabbed it is whether, having wrongfully (negligently, in light of the jury's finding that Officer Bewley did not act with malice) set the deadly circumstances in motion, he can be held liable if the actual firing of the weapon was unintended, accidental, or the product of Meade's reaction.

■   The law surrounding the confluence of foreseeability of harm and intervening cause was recently summarized by the Court of Appeals in *Atlantic Mutual v. Kenney,* 323 Md. 116, 591 A.2d 507 (1991) and *Hartford Ins. Co. v. Manor Inn,* 335 Md. 135, 642 A.2d 219 (1994). In both cases, the Court cited, and quoted, *Restatement (Second) of Torts,* § 435:

"Foreseeability of Harm or Manner of Its Occurrence

(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm *or the manner in which it occurred* does not prevent him from being liable.

(2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm."

(Emphasis added.)

Quoting from earlier cases, the *Atlantic Mutual* Court, at 129, confirmed its previously expressed view that:

"[T]he defendant is liable where the intervening causes, acts, or conditions were set in motion by his earlier negligence, or naturally induced by such wrongful act, or omission, or even it is generally held, if the intervening acts or conditions were of a nature, the happening of which was reasonably to have been anticipated, though they have been acts of plaintiff himself" (quoting from *Penn. Steel Co. v. Wilkinson,* 107 Md. 574, 581, 69 A. 412 (1908), in turn quoting from 21 *Am. & Eng. Ency.* 490).

 

and that

"[A] defendant guilty of primary negligence remains liable 'if the intervening event is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation.'" (quoting from *State v. Hecht Company*, 165 Md. 415, 421, 169 A. 311 (1933).

*See also* § 447 of the *Restatement (Second)*, also cited by both the *Atlantic Mutual* and *Hartford Ins. Co.* Courts.

Under these principles, we find no error in the court's instruction. When a police officer unlawfully attempts to arrest an individual, who has a right to flee and resist, and unlawfully pursues and confronts the individual with a drawn and loaded weapon, the officer must anticipate that the individual may attempt to deflect the aim of the officer, or even attempt to disarm him, by grabbing at or for the weapon or the arm holding it. The attempt may, under the circumstances, be foolish, but it is certainly foreseeable and is neither extraordinary nor "entirely improbable." It is equally foreseeable that, in such an event, the weapon may discharge and may cause significant harm. The officer thus remains culpable under articles 24 and 26.

### Jury Instruction On Shooting

Officer Bewley requested the court to instruct the jury that, even if it found that he violated Mr. Meade's rights under articles 24 and 26 by making an unlawful arrest, it must determine whether he "acted deliberately" in shooting Mr. Meade and that it could not award damages for the shooting unless it found such deliberation. He complains that the court refused to give that instruction.

Essentially for the reasons discussed immediately above, we find no error in the court's ruling. It was not necessary for the jury to find that the shooting was deliberate in order to hold Officer Bewley liable for the harm caused by the shooting.

### Malicious Prosecution

■ Officer Bewley's final complaint is that the evidence was insufficient to sustain the verdict on the malicious prosecution count because there was no finding of malice and because the "stetting" of the charges did not constitute a favorable termination of them.

■ The first part of the complaint, proceeding from the notion that the jury may have found malice simply from the fact that Officer Bewley acted without probable cause, is without a factual basis. Although the court told the jury that malice was not required in order to find a violation of articles 24 and 26, when instructing on malicious prosecution, it made clear that Officer Bewley would not be liable for that tort "unless you find he has acted with malice." The court then informed the jury that "a person acts [with malice] in regard to malicious prosecution if his primary purpose in starting a prosecution is other than bringing an offender to justice."

There was no objection to those instructions, and we must assume that the jury followed them. Its verdict on the malicious prosecution count thus presupposes that it found malice, as defined by the court, in the commencement of the prosecution.

The second aspect of the complaint is more significant. We think it has merit.

■ One of the elements of the tort of malicious prosecution is that the criminal prosecution terminate in favor of the accused. *Exxon Corp. v. Kelly,* 281 Md. 689, 693, 381 A.2d 1146 (1978); *Banks v. Montgomery Ward & Co.,* 212 Md. 31, 128 A.2d 600 (1957). Generally, for purposes of this tort, criminal proceedings are regarded as terminated in favor of the accused upon a discharge of the accused by a magistrate (in Maryland, a judge) at a preliminary hearing, refusal of a grand jury to indict, "the formal abandonment of the proceedings by the public prosecutor," quashing of an indictment or information, acquittal, or a final order in favor of the accused by a trial or appellate court. *Restatement (Second) of Torts,*

§ 659, cited with approval in *Banks v. Montgomery Ward & Co., supra.* In § 660, the *Restatement* adds that termination in favor of the accused, other than by acquittal, is not sufficient to meet the requirements of an action for malicious prosecution if the charge was withdrawn or the prosecution abandoned "pursuant to an agreement of compromise with the accused," because of misconduct by the accused that prevents trial, out of mercy requested or accepted by the accused, or because new proceedings have been instituted.

Here, as we indicated, the charges against Mr. Meade were placed on the "stet" docket, where they have remained for more than a year. That kind of disposition is not directly accounted for in the *Restatement* list, perhaps because, as we indicated in our discussion of the history, nature, and effect of such a disposition in *State v. Jones,* 18 Md.App. 11, 305 A.2d 177 (1973), it is not one commonly recognized outside of Maryland and perhaps three other States.

The Court of Appeals appeared to have this issue before it in *Fitzwater v. Tasker,* 259 Md. 266, 269 A.2d 588 (1970). That too was a malicious prosecution case arising from an underlying criminal prosecution that purported to end in a "stet." The defendant, Fitzgerald, had sold a car to the plaintiff, Tasker, taking back an installment note as part of the purchase price. The plaintiff was late making the first payment; after the payment was made, the defendant procured a warrant charging the plaintiff with the theft of the car. When the matter came before the magistrate who had issued the warrant, the defendant stated that he wanted to drop the charge. The State's Attorney, who was present, authorized the magistrate to enter the case marked "stet." Tasker, wanting some evidence that "had had been cleared of the charge," asked for a letter to that effect. Obligingly, the magistrate gave him a letter stating that the case had been marked "stet," "which in effect means that the State was unwilling and unable to prosecute."

The question was raised in the ensuing civil action whether the underlying prosecution had terminated in Tasker's favor.

Though certainly cognizant of the effect of a "stet" in Maryland, the Court nonetheless held that the prosecution had terminated in Tasker's favor. It said, in that regard, at 274:

"In the present case the facts indicate to us that the proceeding before the committing Magistrate, although somewhat irregular, did terminate in favor of Tasker because of the inability or unwillingness of the State's Attorney to prosecute. Magistrate Maroney states this is the effect of the 'Stet' in the letter.... The entry of a 'Stet' in its technical sense was inappropriate in the proceeding before the committing Magistrate but its meaning to him was clear as he stated and the Magistrate's action terminated the proceeding in Tasker's favor."

That is a very different situation than the present case. The *Fitzgerald* Court, in effect, held that the "stet" was not really a "stet," in the normal Maryland sense, but was instead a final disposition of the case in Tasker's favor. The evidence before the Court fully supported that determination. Here, there is no such evidence. This was not a prosecution begun by a private citizen who later had a change of heart. There is nothing to show that Officer Bewley desired to abort the prosecution; we know nothing more than that the State placed the case against Meade on the "stet" docket, without assigning any reasons. What is before us then, unlike the situation in *Fitzgerald,* is a classic "stet."

As we observed in *Jones,* the entry of a "stet" is merely a determination that the State will not proceed against the accused on that indictment or information at that time. It does not terminate the prosecution but simply suspends all further proceedings and "permits an accused to be proceeded against at a later date under the same charging document." *State v. Moulden,* 292 Md. 666, 673, 441 A.2d 699 (1982); *Hooper v. State,* 293 Md. 162, 170, 443 A.2d 86 (1982). *See also State v. Weaver,* 52 Md.App. 728, 451 A.2d 1259 (1982). By virtue of Md. Rule 4–248(a), however, the suspended animation is not entirely without consequence. For one thing, unlike a *nolle prosequi,* a "stet" cannot be entered over the objection of the accused. A "stetted" charge may be resched-

uled for trial at the request of either party within one year, but after the expiration of the year, it may be scheduled for trial "only by order of the court for good cause shown."

A case may be "stetted" for a variety of reasons. Most often, we suspect, a "stet" operates as a form of pre-trial probation; the charge remains open and available for prosecution at the will of the prosecutor, at least for a year, thereby encouraging the accused to modify his behavior and not to get into further trouble. It may come about out of mercy or sympathy for the accused who may, in the prosecutor's benevolent view, have already suffered enough through other circumstances. It may be that the prosecutor is unsure of his ability to prevail based on the evidence then available and the accused chooses not to force a trial. There may be other motives as well. But, as the rule makes clear, a "stet" cannot be entered without the concurrence of the accused; he need not affirmatively consent, but it cannot be entered over his objection. He can prevent the "stet" from occurring, he can cause the case to be removed from the "stet" docket on his own motion at any time during the one-year period, and he can request the court to remove it thereafter.

Considering all of these factors, we are convinced that a "stet," even after a year, is not a termination in favor of the accused. The *Restatement*, in § 660, Comment c., dealing with "Compromise," makes the point that:

"Although the accused by his acceptance of a compromise does not admit his guilt, the fact of compromise indicates that the question of his guilt or innocence is left open. *Having bought peace the accused may not thereafter assert that the proceedings have terminated in his favor.*"

(Emphasis added.)

A "stet" is not *necessarily* a compromise, but it surely is in the nature of one. If the accused wishes to clear his name, have a court or jury declare his innocence, and then pursue a tort action against his accuser, he has the ability to do so by either objecting to the "stet" in the first instance or having the case removed from that docket subsequently. It

seems to us unfair for the accused to have his cake and eat it too—to allow his guilt or innocence to remain undetermined in the criminal action and then to sue on the premise that the proceeding terminated in his favor. *Compare Hyde v. Greuch,* 62 Md. 577 (1884).

For these reasons, we conclude that the court erred in submitting the malicious prosecution claim to the jury; on this record, it was bound to enter judgment for the defendants.

### Effect And Conclusion

Because the court did not ask the jury to render separate damage awards on the Constitutional torts and the malicious prosecution, we cannot tell how the jury apportioned its award. That is an issue raised by both Officer Bewley and by Mr. Meade, but, in light of our conclusion as to the malicious prosecution, one we need not address. Having concluded that the court did not err in submitting the Constitutional claims to the jury but that a defendants' judgment should have been entered on the malicious prosecution claim, we shall remand the case to the circuit court for a new trial on damages only, arising from the Constitutional torts. In light of this disposition, we need not address any of the other, unaddressed, issues.

JUDGMENT VACATED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR NEW TRIAL ON DAMAGES IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID ONE–HALF BY APPELLANT BEWLEY AND ONE–HALF BY APPELLEE MEADE.